Filed 7/28/15  P. v. Scott CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CLIFFORD ALBERT SCOTT, JR.,<br><br>    Defendant and Appellant. | 2d Crim. No. B254789<br>(Super. Ct. No. F481801)<br>(San Luis Obispo County) |

A jury convicted Clifford Albert Scott, Jr., of attempted premeditated murder of a peace officer (Pen. Code,[1] §§ 187/664, count 1); assault with a firearm on a peace officer (§ 245, subd. (a)(1), count 2); evading of a peace officer (Veh. Code, § 2800.2, subd. (a), count 5); and transportation of a controlled substance (Health & Saf. Code, § 11352, subd. (a), count 6).  The jury also found true as to counts 1 and 2 that Scott personally discharged a firearm (§ 12022.53, subd.(c)).  Scott pled no contest to count 3, possession of a firearm by a felon (§ 29800, subd. (a)(1)), and count 4, carrying a loaded firearm in a public place (§ 25850, subd. (a)).  The trial court found Scott had suffered one prior strike pursuant to the three strikes law (§§ 667, subds. (b)-(i); 1170.12, subds. (a)-(d)) and had served a prior prison term (§ 667.5, subd. (b)).

---

[1] All statutory references are to the Penal Code unless otherwise stated.

On count 1, the court sentenced Scott to 15 years to life, doubled to 30 years to life pursuant to the three strikes law, plus a consecutive 20 years for personal use of a firearm, plus a consecutive one year for the prior prison term. On count 2, the court sentenced Scott to the upper term of nine years, plus a consecutive twenty years for the firearm enhancement, plus a consecutive one year for the prior prison term. The term on count 2 was stayed pursuant to section 654. On count 3, the court sentenced Scott to a term of eight months, doubled to sixteen months pursuant to the three strikes law.

On count 4, the court sentenced Scott to two years, stayed pursuant to section 654. On count 5, the court sentenced Scott to eight months, doubled to sixteen months pursuant to the three strikes law, plus a consecutive one year for the prior prison term. On count 6, the court sentenced Scott to four years, doubled to eight years pursuant to the three strikes law. The total term is 32 years 8 months, plus a consecutive 30 years to life. The court awarded 488 days actual credit and 73 days conduct credit for a total of 561 days credit.

We reverse count 6, transportation of a controlled substance. We also correct the judgment to reflect 489 days of actual presentence custody. We affirm the judgment in all other respects.

FACTS

On October 27, 2012, at approximately 5:15 a.m., California Highway Patrol Officer Michael Muell stopped a grey Camaro for speeding. The driver and a passenger in the rear seat were women. Scott was sitting in the front passenger seat. Muell approached the front passenger window on foot. He saw that Scott was watching every move he made. This made Muell nervous so he called for backup.

Officers David Agredano and Adrian Ayala responded to the backup request. Muell ordered the driver to step out of the Camaro. She complied. Muell asked Agredano to examine her for being under the influence of marijuana.

Muell asked Scott what his name is. Scott said his name is Eric. Muell asked for identification, but Scott said he had none.

2

Muell then asked Scott to step out of the car. Muell attempted to open the passenger door where Scott was sitting. The door was locked. Scott began crawling over the center console into the driver's seat. Muell told him to stop, but Scott told him the passenger door was broken. Scott seated in the driver's seat began revving the engine. He put the car in gear and rapidly accelerated onto the freeway. Muell and Ayala gave chase in separate cars, while Agredano stayed with the driver.

Scott drove at approximately 90 miles per hour. Ayala was behind Scott with Muell behind Ayala. After driving a short distance on the freeway, Scott took an off-ramp leading to the City of Paso Robles. He was going too fast to complete a left turn onto a city street and crashed into a tree. Ayala and Muell stopped behind the damaged Camaro. Scott got out of the car and began running. Ayala gave chase on foot. Muell stayed with the back seat passenger, who was crying and screaming.

Ayala chased Scott down the street. He saw Scott running along a building roof. Ayala believed the only way Scott could get down from the roof was by jumping. Ayala broke off the pursuit to get a better vantage point. After asking other officers to guard an intersection to prevent Scott's escape, Ayala returned to the crashed Camaro to get his patrol car.

Ayala drove back to the area where he last saw Scott. He drove past a dimly lit alley that had several recycling dumpsters in it. He left his patrol car, turned on his flashlight and drew his Taser. He decided a Taser would be sufficient because Scott did not appear to be armed.

Ayala shined his flashlight into a dumpster with an open lid. He saw some movement that he assumed was caused by Scott. He ordered Scott to come out and threatened to use his Taser. He heard Scott agree to comply. When Scott came up, however, he was pointing a handgun directly at Ayala's head. Scott fired multiple gunshots at Ayala in rapid succession. Ayala shot his Taser at Scott, but it

3

had no effect. Ayala knew he had been hit in the abdomen and backed away to decrease the chance of being shot in his head.

Scott stopped firing briefly as he fell out of the dumpster. Ayala dropped his Taser and drew his handgun. Scott resumed firing at him. Ayala ran toward Scott and fired at him from 20 feet away. Scott raised his hand in a defensive posture and began running away, pointing his gun back at Ayala as he ran.

Ayala stopped the pursuit to reload with a magazine he kept in his uniform. Scott stopped, too. Ayala did not know whether Scott intended to resume running or reengage him. After Ayala finished reloading, he continued to shoot at Scott. Scott continued to run. Scott ran fluidly. It did not appear he had been hit. Concerned that the shots might hit a bystander, Ayala took careful aim and fired one last shot.

The sound of gunshots drew other officers to the area. Scott stopped running and surrendered.

Ayala was hit in the thumb and forearm. He was also hit on his bullet resistant vest, leaving a bruise on his abdomen.

Officers found 9.22 grams of cocaine in a baggie in the pocket of Scott's jeans. A usable amount is 0.2 grams.

*Defense*

Scott had gunshot wounds to his abdomen, both legs and shoulder.

The parties stipulated that Scott's blood was on the Taser barbs collected at the shooting scene.

DISCUSSION

I.

Scott contends he received ineffective assistance of counsel for failing to introduce evidence that he was under the influence of methylone (bath salts), and for failing to request voluntary intoxication instructions.

4

A blood test taken at the hospital after Scott was arrested showed Scott had methylone, commonly known as bath salts, in his blood. Prior to trial, Scott's counsel moved to exclude any mention of bath salts during trial. The trial court granted the unopposed motion.

On appeal, Scott points out that evidence of voluntary intoxication is admissible to show he did not form the specific intent required for an offense. (§ 29.4, subd. (b).) Two of the crimes of which Scott was convicted – willful deliberate and premeditated attempted murder and evading a peace officer – require specific intent. (See *People v. Guerra* (1985) 40 Cal.3d 377, 386; *People v. Schumacher* (1961) 194 Cal.App.2d 335, 339-340.)

Instead of arguing Scott was too intoxicated to form the required specific intent, Scott's counsel argued: Officer Ayala used excessive force to subdue Scott by firing his Taser before Scott fired at him; Scott fired at least one shot by accident as a result of his reaction to the Taser; Scott continued to fire his handgun in a state of confusion, pain and fear without the intent to kill Ayala; and Scott had an unreasonable but good faith belief that he could defend himself. Scott claims none of these defenses is inconsistent with voluntary intoxication.

To prevail on a claim of ineffective assistance of counsel, the defendant must establish both representation below an objective standard of reasonableness, and also resulting prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 694; *People v. Bolin* (1998) 18 Cal.4th 297, 333.) Prejudice is established only if the record shows a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. (*Strickland*, *supra*, at p. 694.) Where the record does not reveal the reasons for counsel's actions or omissions, the conviction must be affirmed unless counsel was asked for an explanation and failed to provide one or there simply could be no satisfactory explanation. (*People v. Ledesma* (1987) 43 Cal.3d 171, 218.)

Here the record does not reveal why defense counsel did not raise voluntary intoxication as a defense. But there is a reasonable explanation. Counsel

5

could reasonably conclude a voluntary intoxication defense was unlikely to succeed and could be prejudicial. Jurors are unlikely to find that bad behavior excuses or reduces criminal culpability. Jurors are much more likely to view a drug user negatively than they are to find that drug use excuses or mitigates his criminal conduct.

In any event, even if counsel's performance was deficient, it was harmless by any standard. There is simply no evidence to suggest Scott was so intoxicated he could not form the required specific intent. To the contrary, the evidence shows Scott's actions during the entire episode were purposeful.

When Officer Muell detained the car in which Scott was riding, Scott must have known he was in trouble. He was a felon in possession of a firearm with a baggie of cocaine in his jeans' pocket. Yet, he did not behave irrationally. Instead, he gave Muell a false name and remained seated in the car. It was only when Muell directed Scott to step out of the car that he fled. Even though Scott was armed, he did not confront Muell with a weapon. Instead, he simply moved into the driver's seat and drove away.

After Scott crashed his car, he fled on foot. Although Ayala was in pursuit, Scott did not immediately confront him with a weapon either. Scott had the presence of mind to climb up on a roof where Ayala lost track of him. Then Scott hid in a dumpster. When Ayala told Scott to come out, he lied, agreeing to comply. It was only when Scott knew Ayala had him trapped in the dumpster and threatened him with a Taser that Scott used his weapon. He was able to hit Ayala three times. When Scott knew he could go no further, he peacefully surrendered.

Scott did not act like a person who was so intoxicated he was unable to form the specific intent required for the crime of which he was convicted. Any omission on the part of Scott's counsel was harmless, even if the standard is beyond a reasonable doubt.

II.

Scott requests that we undertake an independent review of Officer Ayala's personnel file.

Scott filed a motion pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (Evid. Code, § 1043) requesting the trial court to review Ayala's personnel file for instances of excessive force, improper tactics and providing false statements. The trial court reviewed the file in camera and advised counsel there is nothing discoverable.

We have reviewed the record of the trial court's in camera examination of Ayala's personnel file. The court complied with the procedural requirement of a *Pitchess* hearing, a court reporter was present, and the custodian of records was sworn prior to testifying. The custodian brought all the records for review by the court.

We have reviewed the sealed personnel file and concur with the trial court's finding that there is nothing discoverable.

III.

The People concur with Scott on two issues.

Count 6, transportation of a controlled substance, must be reversed. Prior to January 1, 2014, Health and Safety Code section 11352 was interpreted to include transportation for personal use. (*People v. Rogers* (1971) 5 Cal.3d 129, 134-135.) As of January 1, 2014, the Legislature limited the offense to "transport for sale." (Health & Saf. Code, § 11352, subd. (c); Stats. 2013, ch. 504, §§ 1-2.)

The defendant is entitled to the benefit of a statute mitigating punishment where the case has not reached a final disposition on direct appeal. (*People v. Rossi* (1976) 18 Cal.3d 295, 304.) The trial court did not instruct the jury that transportation must be for sale. The People concede we must reverse count 6.

Scott contends retrial on count 6 is prohibited because there is no substantial evidence that he transported the cocaine for sale. (Citing *Burks v.*

7

*United States* (1978) 437 U.S. 1, 16-18 [retrial prohibited where conviction is reversed for insufficient evidence].)

But the People argue retrial is not prohibited where the insufficient evidence is due to the prosecutor's mistake of law. The People rely on *People v. Shirley* (1982) 31 Cal.3d 18. There, our Supreme Court determined that a witness' statement made under hypnosis is not admissible. Because the statement was the only evidence of guilt, our Supreme Court reversed. The Court determined, however, that retrial was not prevented by the rule barring retrial upon reversal for insufficient evidence. The Court stated: "The rule achieves its aim—i.e., of protecting the defendant against the harassment and risks of unnecessary repeated trials on the same charge—by the device of giving the prosecution a powerful incentive to make the best case it can at its first opportunity. [Citation.] But the incentive serves no purpose when, as here, the prosecution did make such a case under the law as it then stood . . . ." (*Id.* at p. 71.)

At the time of the trial in *Shirley*, the law concerning the admissibility of statements made under hypnosis was uncertain. The prosecutor made his best case under the law "as it then stood." (*People v. Shirley*, *supra*, 31 Cal.3d at p. 71.) Here, however, at the time of Scott's trial the law was clear, section 11352 had previously been amended to require that the transportation be for sale. The prosecutor did not make his best case under the law as it then stood. The policy behind the rule barring retrial is to give the prosecution a powerful incentive to make the best case it can at the first opportunity. (*Ibid.*) That policy would be violated by allowing retrial under these circumstances.

The People also concede that Scott is entitled to 489 actual days in custody. This plus 73 days conduct credit is 562 days of presentence custody credits.

We reverse count 6, transportation of a controlled substance. We modify the judgment to reflect Scott is entitled to 489 days of actual presentence custody. The superior court shall amend the abstract of judgment accordingly and

8

send a certified copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>


GILBERT, P. J.


We concur:


YEGAN, J.


PERREN, J.

9

John A. Trice, Judge

Superior Court County of San Luis Obispo

_____

Laini Millar Melnick, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Chung L. Mar, Idan Ivri, Deputy Attorneys General, for Plaintiff and Respondent.